**AKZO COATINGS, INCORPORATED, and The O'Brien Corporation, Plaintiffs–Appellants,**

v.

**AIGNER CORP., et al., Defendants– Appellees.**

No. 92–3820.

United States Court of Appeals, Seventh Circuit.

Argued May 5, 1993.

Decided July 11, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 12, 1994.*

* Honorable Walter J. Cummings did not participate in the consideration of this petition.

Timothy W. Woods, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, IN, Timothy L. Harker, Colleen M. Morgan, Gary R. Letcher (argued), David J. Kaufman, Washington, DC, for Akzo Coatings, Inc. and O'Brien Corp.

Bradley D. Jackson, Foley & Lardner, Madison, WI, Pierre C. Talbert (argued), Robert Dupuy, Foley & Lardner, Chicago, IL, for Aigner Corp., American Can Co., Dexter Corp., Duplicolor Products Co., Graham Paint & Varnish Co., Inc., Illinois Bronze Paint Co., Motorola, Inc., Prefinish Metals, Inc., Reynolds Metals Co., S & E Elec. Co., Sherwin Williams Co., Valspar, Inc., Whittaker Corp. and Morton Intern. Inc.

Richard W. Paulen, Barnes & Thornburg, Elkhart, IN, Pierre C. Talbert, Robert Dupuy, Toley & Lardner, Chicago, IL, for Rollcoater.

Catherine R. McCabe, Anne S. Almy, Dept. of Justice, Environmental Defense Section, Washington, DC, for U.S. amicus curiae.

Before EASTERBROOK and ROVNER, Circuit Judges, and WILLIAMS, District Judge.**

ILANA DIAMOND ROVNER, Circuit Judge.

After completing the emergency clean-up work they were ordered to perform at a hazardous waste site in Indiana, Akzo Coatings, Incorporated and The O'Brien Corporation (collectively, "Akzo") brought suit for contribution against Aigner Corporation and a number of other companies (collectively, "Aigner") that allegedly had generated wastes which had been treated or disposed of at that site. The district court granted summary judgment in favor of Aigner, finding that Akzo's work was a "matter addressed" by the consent decree that Aigner had entered into with the government. *See* 42 U.S.C. § 9613(f)(2). Because we conclude that Akzo's work was for the most part not a "matter addressed" by the consent decree, we reverse the district court's judgment in part.

## I. FACTS

Between 1972 and 1985, more than 200 firms generated hazardous wastes that were sent to various facilities within the Kingsbury Industrial Park in Kingsbury, Indiana comprising what we refer to as the "Fisher–Calo" site. Among these facilities was the "Two–Line Road" facility, where Fisher–Calo Chemicals and Solvents, Incorporated and its predecessor corporations had conducted solvent recycling operations from 1981 until 1985.

In 1988, the federal Environmental Protection Agency ("EPA") concluded that the wastes stored at the Two–Line Road facility posed an imminent danger of release into the surrounding environment. Exercising the authority granted under section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606, the EPA issued a unilateral administrative order requiring Akzo and some twenty other companies that qualified as "liable persons" under CERCLA[1] to conduct certain "emergency removal activities" at the Two–Line Road facility. Among the tasks required were: (1) fencing off and otherwise securing the facility; (2) securing and removing all drums, tanks, and other containers of hazardous waste from the premises, including buried containers; and (3) determining the extent to which the soil was contaminated and removing any soil that was visibly polluted. Akzo complied with the EPA's order, incurring

---

** The Honorable Spencer Williams, of the Northern District of California, sitting by designation.

1. Section 107(a) of the statute deems liable for cleanup costs anyone who (1) presently owns a hazardous waste site; (2) owned the site when hazardous materials were disposed of there; (3) arranged for the disposal of wastes at the site, or for transportation of wastes to the site for disposal; or (4) accepted wastes for transportation to the site for disposal. 42 U.S.C. § 9607(a). Among the companies cited in the EPA's 1998 order were Fisher–Calo Chemical Corporation, the present owner and operator of the Fisher–Calo site, along with other companies that, like Akzo, had generated hazardous wastes and arranged for the disposal or the transport for disposal of the wastes at the Fisher–Calo site. 1988 Order at 4, ¶ 3.

costs in excess of $1.2 million.[2] The work specified by the EPA's 1988 order has largely been completed.[3]

In May 1990, approximately thirty-five companies that had generated wastes disposed of at the Fisher–Calo site and were thus "potentially responsible parties" ("PRPs") under CERCLA (*see* n. 1, *supra*) initiated efforts to quantify the nature and extent of the liability of any and all PRPs for clean-up of the site and to evaluate the types of work that the EPA and Indiana might order them to perform. Akzo was among the firms that engaged in this effort, and it incurred further costs in doing so. However, Akzo withdrew from the group in February 1991 after concluding that it was not liable for any contamination of the Fisher–Calo site beyond the Two–Line Road facility.

In August 1990, the EPA published a Record of Decision ("ROD") outlining the work it believed necessary to accomplish a complete decontamination of the site. With respect to the work mandated by the 1988 Order, the ROD stated:

A removal action at the north end of the Two–Line facility is being conducted under a Unilateral Removal Order issued by U.S. EPA. The removal action is being carried out in two phases: Phase I involves the staging of drums for removal during Phase II. Phase II includes the excavation of the contaminated soils and buried tanks and drums located on the north end of the Two–Line Road property. The visibly contaminated soils, tanks and drums will be removed from the north end of the Two–Line Road facility and transported to an appropriate disposal facility. A further removal action is being scoped for the south end of the Two–Line facility. *For the purposes of this Record of Decision, it is assumed that all drums, tanks, and containers on the Two–Line Road property requiring remedial action are being addressed by these actions.*

ROD Summary at 5 (emphasis supplied). The EPA began to negotiate with the PRPs to implement the clean-up outlined in the ROD, and by the end of the following year, it had finalized an agreement with more than 200 PRPs. The EPA filed suit against these PRPs in late December 1991 and asked the court to approve the proposed consent decree it filed contemporaneously with its complaint. *United States v. Accurate Partitions Corp.*, Civ. No. S91–00646 M (N.D.Ind.). Pursuant to the decree, the settling PRPs agreed to undertake the actions specified by the 1990 ROD and to compensate the EPA for some of the costs it had incurred to date. In late February 1992, following the requisite notice period, *see* 42 U.S.C. § 9622(d)(2), the district court approved the consent decree. Aigner was a party to this decree; Akzo was not.

In 1991, Akzo brought suit against Aigner seeking, inter alia, contribution under CERCLA for the initial clean-up work it had performed at the behest of the EPA as well as the voluntary costs it had incurred in studying the long term clean-up of the site with other PRPs.[4] Aigner moved to dismiss the complaint, arguing that the work for which Akzo sought contribution was a "matter addressed" by the *Accurate Partitions* consent decree and thus Akzo's claim was barred by the statute. The district court converted the motion into one for summary judgment in accordance with Fed.R.Civ.P. 12(b) and ruled in Aigner's favor, agreeing that Akzo sought contribution for a "matter addressed" by the consent decree. *Akzo Coatings, Inc. v. Aigner Corp.*, 803 F.Supp.

---

**2.** Because the claims we address here were disposed of largely on the pleadings, we have assumed as true the facts as Akzo has alleged them. On remand, of course, it will be Akzo's burden to establish its entitlement to contribution from the defendants within the parameters of our opinion.

**3.** The briefs reveal a bit of a skirmish on this point, which we conclude is immaterial. *See* n. 9, *infra*.

**4.** Aigner Corporation and three of the other defendants who signed the consent decree had, like Akzo, been named in the EPA's 1988 Order and performed initial cleanup work in response to that order. Akzo makes no claims against these four defendants for costs it incurred in response to the 1988 Order; however Akzo does seek compensation from these defendants for some of the other costs it has incurred voluntarily. Having made this clarification, we will for convenience continue to refer to the defendants collectively as "Aigner".

1380 (N.D.Ind.1992). Although the court's ruling did not dispose of all of Akzo's claims, the court certified its ruling for immediate appeal under Fed.R.Civ.P. 54(b).

## II. ANALYSIS

Section 113(f) of CERCLA, added to the statute in 1986, authorizes claims for contribution, subject to the limitation set forth in paragraph (2):

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

**(2) Settlement**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f). The district court concluded that Akzo is seeking contribution under section 113(f)(1) and that Aigner is not liable because the clean-up of the entire Fisher–Calo site is a "matter addressed in the settlement." Akzo disagrees with both conclusions: it contends that it is not seeking "contribution" at all and that the work the EPA ordered it to perform at the Two–Line Road facility was not a "matter addressed" in the consent decree. The United States, offering its opinion as amicus curiae, suggests that Akzo is wrong on the first argument but right on the second. We agree.

■ That Akzo's claim is one for contribution we have no doubt. Akzo argues that its suit is really a direct cost recovery action brought under section 107(a) rather than a suit for contribution under section 113(f)(1); and it is true that section 107(a) permits any "person"—not just the federal or state governments—to seek recovery of appropriate costs incurred in cleaning up a hazardous waste site. 42 U.S.C. § 9607(a), subpart (B). Yet, Akzo has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a)—it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. Instead, Akzo itself is a party liable in some measure for the contamination at the Fisher–Calo site, and the gist of Akzo's claim is that the costs it has incurred should be apportioned equitably amongst itself and the others responsible. Complaint ¶¶ 10, 11. That is a quintessential claim for contribution. *See Restatement (Second) of Torts* § 886A (1979); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989); *In re Dant & Russell, Inc.*, 951 F.2d 246, 249 (9th Cir.1991). Section 113(f)(1) confirms as much by permitting a firm to seek contribution from "any *other*" party liable under sections 106 or 107. Whatever label Akzo may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Akzo's suit accordingly is governed by section 113(f). *Accord Transtech Indus., Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1085–87 (D.N.J.1992), *appeal dismissed,* 5 F.3d 51 (3d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994). To the extent cases such *Burlington N. R.R. Co. v. Time Oil Co.,* 738 F.Supp. 1339, 1342–43 (W.D.Wash.1990), and *Key Tronic Corp. v. United States,* No. C–89–694–JLQ, Order at 15 (E.D.Wash. Aug. 9, 1990), *judgment rev'd on other grounds,* 984 F.2d 1015 (9th Cir. 1993), *aff'd in part, rev'd in part, and remanded,* — U.S. ——, 114 S.Ct. 1960, 128

L.Ed.2d 797 (1994), have suggested otherwise, we decline to follow them.[5]

Akzo suggests that whether its claim is one for contribution may depend on whether the harm done to the Fisher–Calo site is divisible. If, for example, all of Akzo's solvents were deposited at Two–Line Road while Aigner's were deposited at a different facility, Akzo's claim for cleaning up the Two–Line Road site looks less like one for contribution and more like a section 107 cost recovery action. But the basis for holding Aigner liable in that scenario escapes us. Only the hypothesis that the whole Fisher–Calo site is the proper unit of analysis, or that *both* Akzo and Aigner sent solvents to Two–Line Road, would give Akzo a legitimate claim against Aigner. Either way, Akzo is seeking to apportion liability for an injury to which it contributed.[6]

■ Our attention thus turns to whether the contribution that Akzo seeks is for "matters addressed" by the consent decree that Aigner signed. The statute itself does not specify how we are to determine what particular "matters" a consent decree addresses. Section 113(f)(1) does direct us, however to "use[ ] such equitable factors as the court determines are appropriate" in resolving contribution claims. 42 U.S.C. § 9613(f)(1). Thus, rather than adopting any bright lines, Congress quite clearly envisioned a flexible approach to contribution issues. *See Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir.1994) ("In determining the relative contribution of the parties, courts must look to the 'totality of the circumstances.' ") (quoting *Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992)); *FMC Corp. v.*

*Aero Indus., Inc.*, 998 F.2d 842, 846–47 (10th Cir.1993) (collecting cases).

Our starting point, naturally, is the consent decree itself. The decree is expansive, not just in terms of its length (sixty-four pages, exclusive of its appendices) but its scope as well. It addresses the Fisher–Calo site as a whole, defining the relevant "Facility" as "the location where treatment, storage, disposal or other placement of hazardous substances was conducted by Fisher–Calo Chemical Company, and those areas where such substances have come to be located." Consent Decree at 7, ¶ 4. It also incorporates wholesale the far-ranging remedial plan set forth in the EPA's 1990 ROD (*id.* at 5, ¶ 1; 11, ¶ 5), a plan which, barring unforeseen problems, would accomplish a complete clean-up of the site at an anticipated cost of more than $30 million. The decree also requires the settling defendants to pay the EPA and the State of Indiana nearly $3.1 million for their costs to date. *Id.* at 38–39, ¶ 49. Finally, and most significantly from Aigner's perspective, the decree includes a covenant not to sue the settling defendants for "covered matters," which include "any and all claims available to the United States under Sections 106 and 107 of CERCLA ... relating to the Facility, and any and all claims relating to the Facility available to the State under Indiana Code 13–7–8.7 and common law nuisance." *Id.* at 46, ¶ 66. Consequently, with certain specific exceptions that are immaterial here (*id.* at 46–49, ¶¶ 67–71), Aigner has been released of any liability to either Indiana or the United States.

---

5. Our disagreement with *Burlington N. R.R. Co.* is limited to that court's conclusion that claims among PRPs are not governed by section 113(f)(2). *See infra* at 767.

6. Akzo reminds us that in Count Four of its complaint, it seeks total recovery of the voluntary costs it incurred in conjunction with the other PRPs who sought to study and delineate their potential liability for further action at the Fisher–Calo site. Akzo bears none of the responsibility for these costs, it argues, and therefore its claim is necessarily *not* one for contribution. Even if that rationale does render Count Four something other than a claim for contribution (an issue we need not decide), it does not necessarily clear a

path to recovery. *See United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir.1992) (costs borne by private party in investigating and developing remedial alternatives for purposes of defending against government's suit are not necessary to containment and cleanup of polluted site and thus are not "necessary" response costs recoverable under section 107(a)(4)(B)), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *see also Key Tronic v. United States*, ⸺ U.S. ⸺, ⸺, 114 S.Ct. 1960, 1968, 128 L.Ed.2d 797 (1994). In any event, because Akzo's voluntary response costs were aimed at a permanent clean-up of the site, we believe them barred as "matters addressed" by the *Accurate Partitions* consent decree. *See infra* at 767.

But the fact that the decree bestows comprehensive immunity from claims by the state and federal governments does not necessarily mean that Aigner enjoys the same immunity from claims brought by a party in Akzo's position. Whatever light the government's covenant not to sue may shed on the intended scope of the decree, it should not be treated as dispositive of the contribution protection the settling PRPs are afforded under section 113(f)(2). The government's agreement to seek nothing more from the parties to the decree does not signal an intent to preclude non-settling parties from seeking contribution. *See Transtech,* 798 F.Supp. at 1088–89. As the United States observes:

> If the covenant not to sue alone were held to be determinative of the scope of contribution protection, the United States would not be free to release settling parties from further litigation with the United States, without unavoidably cutting off all private party claims for response costs.

Amicus Br. at 19. Surely this is not what Congress intended. Rather than give undue weight to a provision of the decree having nothing on its face to do with the claims of non-settling parties, we must look to the decree as a whole to decide whether its provisions encompass the type of activity for which Akzo seeks contribution.[7]

Other courts have suggested that the "matters addressed" by a consent decree be determined with reference to the particular location, time frame, hazardous substances, and clean-up costs covered by the agreement. *United States v. Union Gas Co.,* 743 F.Supp. 1144, 1154 (E.D.Pa.1990); *accord Akzo Coatings of America, Inc. v. American Renovating,* 842 F.Supp. 267, 271 (E.D.Mich.1993); *United States v. Colorado & E. R.R.,* 832 F.Supp. 304, 307 (D.Colo.1993); *United States v. Pretty Products, Inc.,* 780 F.Supp. 1488, 1494–95 n. 4 (S.D.Ohio 1991). *See also Akzo Coatings, Inc. v. Aigner Corp.,* 803 F.Supp. at 1384. The United States correctly observes that this should not be treated as an exhaustive list of appropriate considerations, for the relevance of each factor will vary with the facts of the case. Amicus Br. at 17 n. 15. Ultimately, the "matters addressed" by a consent decree must be assessed in a manner consistent with both the reasonable expectations of the signatories and the equitable apportionment of costs that Congress has envisioned. *See Transtech,* 798 F.Supp. at 1088.[8]

---

7. Put another way, because the decree defines "covered matters" only in terms of claims available to the *United States* and the *State of Indiana,* claims that *Akzo* might have based on its own work would seem by definition excluded. For that reason, we do not find it particularly significant that the response costs for which the settling defendants are obligated to reimburse the EPA under the decree may include costs related to the 1988 order. Those costs are obviously separate from the costs that *Akzo* incurred in complying with that order. *See Transtech,* 798 F.Supp. at 1089–90; *accord Akzo Coatings of America, Inc. v. American Renovating,* 842 F.Supp. 267, 272–73 (E.D.Mich.1993); *United States v. Colorado & E. R.R.,* 832 F.Supp. 304, 307 (D.Colo.1993); *Boeing Co. v. Northwest Steel,* No. C89–214M, 1991 WL 549404, at *1, 1991 U.S.Dist. LEXIS 14786, at *1 (W.D.Wash. July 24, 1991).

We note that the decree contains a separate provision (¶ 89) acknowledging the settling defendants' entitlement to contribution protection for "matters addressed in this Consent Decree." However, this provision, like its statutory counterpart, supplies no definition of the "matters addressed."

8. We therefore agree with the dissent that a *project*-specific interpretation per se will not always be appropriate, because the parties might well include in their agreement provisions that are unrelated to the particular work underlying the settlement but nonetheless relevant to the extent of contribution protection provided. *See post* at 771–72. For example, as the dissent points out, the agreement might bestow contribution protection on non-settling PRPs. *See* 42 U.S.C. § 9613(f)(2). The parties might also include a provision protecting the settling PRPs from contribution for work that is otherwise beyond the scope of the decree. *See* n. 14, *infra.* But such terms do not foreclose the kind of fact-specific evaluation of the "matters addressed" we have employed here; they are simply among the circumstances that the court ought to consider. Thus, if the parties have included terms explicitly describing the "matters addressed" by their settlement, then those terms will be highly relevant to, and perhaps even dispositive of, the scope of contribution protection; and no woe of the kind the dissent envisions need befall the parties. *See post* at 772. If, on the other hand, the parties have omitted such terms as they did here (*see* n. 7, *supra* ), or if the terms are ambiguous, then it will be appropriate to consider other factors, such as the scope of the work called for in the agreement, the harms addressed, time frame, and so on.

Because Akzo's work stands apart in kind, context, and time from the work envisioned by the consent decree, we conclude that it is not a "matter addressed" by the decree. Akzo was required to engage in "removal" work (42 U.S.C. § 9601(23))—that is, a short-term, limited effort to abate any immediate threat posed by the wastes present at the site. *See Schalk v. Reilly,* 900 F.2d 1091, 1092–93 n. 1 (7th Cir.), *cert. denied,* 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990). The consent decree, on the other hand, provides for the kind of long-term, "remedial" work (42 U.S.C. § 9601(24)) necessary to accomplish a complete clean-up of the site. *See Schalk* at 1092–93 n. 1. This distinction is reflected in the two different orders implementing the work. The 1988 order unilaterally directed Akzo to undertake certain "emergency removal activities," including the extraction and disposal of leaking drums and other hazards from the Two–Line Road facility. In contrast, the 1992 consent decree embodies a negotiated settlement designed to implement a long-range remedial plan for the entire site, as outlined in the EPA's 1990 Record of Decision ("ROD"). Neither the decree nor the ROD purports to incorporate the 1988 order; on the contrary, the ROD explicitly assumes "that all drums, tanks, and containers on the Two–Line Road property requiring remedial action are being addressed" by that order. ROD Summary at 5. Indeed, by the time Aigner entered into the consent decree, Akzo's removal work had already been completed.[9] Consequently, it

comes as no surprise that this work was not addressed in the consent decree:

> Settlement negotiations are presumably conducted with affected parties able to participate and work toward a joint cleanup goal. Previous cleanup activities already conducted and paid for by private parties are not likely to be addressed by the government in negotiations of this sort.

*Burlington N. R.R. Co.,* 738 F.Supp. at 1342. Because Akzo's preliminary clean-up work is thus so clearly distinct from the long-range remedial matters addressed by the decree, Akzo is entitled to seek contribution from the settling PRPs under section 113(f)(1).[10]

Our conclusion is different with respect to the voluntary costs that Akzo incurred in conjunction with other PRPs in attempting to anticipate the claims that might be asserted against them by the EPA. In contrast to the limited nature of the initial removal work required by the EPA's 1988 order, the focus of these efforts was on the long-term remedial action necessary to effect a permanent clean-up of the site. In essence, Akzo and its fellow PRPs were attempting to predict, and perhaps shape, the provisions of the consent decree. In that sense, these efforts were necessarily "matters addressed" by the decree, and in the absence of some indication that they accomplished tasks distinct from what the consent decree called for, claims for contribution based on these efforts are barred by section 113(f)(2).

The flexible, fact-based approach we have used to determine what matters are ad-

---

**9.** The parties do not fully agree whether *all* work specified by the EPA's 1988 order was completed. Although in its answer Aigner admits that Akzo "ha[s] fully complied with the USEPA's administrative order dated December 15, 1988" (Answer at 9, ¶ 17), Aigner cites an affidavit in the record indicating that some tasks called for by the order remain outstanding and "are to be addressed pursuant to an agreement between the United States Environmental Protection Agency and the [settling defendants] under the terms and conditions of the Consent Decree." Paulen Aff. ¶ 6, Supp.App. 77. Perhaps all this means is that although Akzo and the other parties subject to the 1988 order completed what work the EPA required of them, a few tasks were by agreement left for another day. In any case, the fact that some portion of the work originally envisioned by the 1988 order has been handled within the

framework of the consent decree only confirms that the remainder was not a "matter addressed" by the decree.

**10.** To the extent that Akzo seeks contribution for any of the attorneys' fees it has incurred, the Supreme Court's recent decision in *Key Tronic Corp. v. United States, supra* n. 6, is controlling. That decision leaves the door open to the recoupment of fees for "lawyers' work that is closely tied to the actual cleanup" of a site, —— U.S. at ——, 114 S.Ct. at 1967, but precludes the recovery of fees incurred in connection with bringing a cost recovery or contribution suit against other PRPs or in defending the plaintiff's interests in settlement negotiations or other proceedings establishing the extent of its liability, *id.* at ——, ——, 114 S.Ct. at 1967, 1968.

dressed by the consent decree may not offer settling parties the same degree of repose as one based solely on the facial breadth of the decree. Yet, we perceive no unfairness to Aigner in the result here. Akzo's work was over and done with by the time Aigner signed the consent decree. Acknowledging a right to contribution in this particular circumstance does not subject a settling PRP like Aigner to open-ended liability for contribution claims based on future, unanticipated remedial work. The extent and cost of Akzo's work were obviously known to (or at least ascertainable by) the parties to the consent decree, and had they wished to make that work a "matter addressed," presumably they could have done so.[11] The fact is they did not, and permitting Akzo to pursue its contribution claim in this context works no undue hardship on Aigner.[12]

Our dissenting colleague takes a different tack, implying that because it lies within the EPA's power to draft the release language more narrowly, we should simply take the

language in this settlement on its face and construe it broadly to include the clean-up work for which Akzo seeks contribution. *Post* at 774. There is some allure in that argument, and had Akzo itself been a party to the agreement, we might find it persuasive. But whatever opportunity Akzo may have enjoyed to comment on the consent decree, it had no control over the language ultimately adopted; indeed, neither the EPA, nor Aigner, certainly, had any incentive to take care with Akzo's contribution rights.[13] Given the sweeping power Congress has given the EPA to extinguish the contribution rights third parties would otherwise enjoy under section 113(f)(2), we believe it prudent to require the settling parties to be more explicit when they intend to bar contribution for work such as Akzo's which, factually speaking (*see post* at 771–72), is not clearly a "matter addressed" by the agreement.[14]

Indeed, we are convinced that a contrary outcome would leave firms like Akzo in an

**11.** The district court's opinion in *Key Tronic Corp. v. United States, supra* at 764, suggests that it might constitute a denial of due process to foreclose non-parties to a consent decree from seeking contribution without some type of hearing. Order at 14–15; *see also General Time Corp. v. Bulk Materials, Inc.,* 826 F.Supp. 471, 476–77 (M.D.Ga.1993); *but see United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 93 (1st Cir.1990); *United States v. Serafini,* 781 F.Supp. 336, 339 (M.D.Pa.1992). We need not address that question, as Akzo has not argued that section 113(f)(2) is unconstitutional either on its face or as Aigner would have it applied here.

**12.** At the same time, because Akzo's claim was choate before the decree was signed, Aigner had the ability to evaluate its exposure and decide whether or not the settlement was still in its best interest absent contribution protection that included Akzo's claim.

**13.** A recurrent theme in Aigner's brief is that Akzo has only itself to blame for its predicament because it refused to enter into the consent decree. *E.g.,* Aigner Br. at 23. We are nonplussed by that view. If we assume, as Akzo alleges, that the EPA's 1988 order forced it to spend sums disproportionate to its culpability, it is not difficult to understand why Akzo was reluctant to contribute anything more for the privilege of signing the consent decree. The most Akzo stood to gain from entering the settlement was protection from further liability, not reimburse-

ment for what it had already spent on the initial clean-up of the Fisher–Calo site.

**14.** Naturally, a consent decree that offered Aigner contribution protection from Akzo was worth more than one that did not, and our analysis places the decree Aigner signed in the latter category. Nonetheless, the approach we have articulated does not necessarily mean that parties in Aigner's position will either contribute less to the settlement or walk away from the bargaining table entirely. In this respect, we find the dissent's discussion of the Recycling Industries hypothetical (*post* at 772) unconvincing. If PRP #2 balks at the $10 million proposal to clean up the West plant, fearing that it will also be on the hook for a share of PRP #1's $10 million clean-up of the East plant, we take it the EPA will do one of two things in order to secure PRP #2's cooperation: (1) add a proviso to the settlement with PRP #2 granting it explicit contribution protection vis à vis the East plant as well as the West, or (2) negotiate a global settlement encompassing both the East and West plants. We need not assume, therefore, that a fact-specific interpretation of the "matters addressed" by a consent decree will impede settlement. Nothing prevents the parties from either defining the "project" addressed by the settlement in an all-encompassing fashion such that the contribution protection afforded by the settlement agreement is correspondingly unlimited, or in the alternative drafting explicit contribution provisions that obviate any need to consider the breadth of the underlying project.

untenable position. A party served with a unilateral order under section 106 has little choice but to comply; the statute places strict limits on prior judicial review of such orders and authorizes fines of up to $25,000 per day for a party who refuses to obey. 42 U.S.C. §§ 9606(b)(1), 9613(h); *see In re CMC Heartland Partners,* 966 F.2d 1143, 1148 (7th Cir.1992). To subsequently preclude a compliant party from seeking contribution for the sums it has expended simply because it had the misfortune to be drafted by the EPA before a remedial plan could be prepared and a settlement negotiated will not expedite cooperative environmental remediation.

> If defendants were permitted to settle with the government for part of the clean-up costs of a site, and then become immune from suit for contribution by private entities who paid for *other* cleanup costs, it would defeat the policy of CERCLA. Settling PRPs should not be made to pay twice for the same clean-ups, but they also should not get a windfall because they settled.

*Akzo Coatings of America,* 842 F.Supp. at 271 (emphasis in original).[15]

The dissent suggests that our rationale is at odds with the Supreme Court's recent opinion in *McDermott, Inc. v. AmClyde,* — U.S. —, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). *Post* at 773. We disagree. As the dissent points out, *McDermott* disavows a rule of liability allocation in admiralty cases that would permit nonsettling parties to seek contribution from parties that have settled. *Id.* at —, 114 S.Ct. at 1467. We do not begin with the blank slate that the Supreme Court confronted in *McDermott,* however. *See id.* at — — —, 114 S.Ct. at 1464–65. Here, Congress has spoken directly to the question of contribution and permitted nonsettling parties to seek contribution for any matter not addressed in the settlement. § 9613(f)(2). Consequently, the case before us is first and foremost one of contractual interpretation, and on that subject, *McDermott* is not controlling.

Of course, policy considerations of the kind discussed in *McDermott* to some extent have informed our decision on how broadly to construe the "matters addressed" by the consent decree. Thus, the dissent urges that the decree be accorded a generous sweep that shields Aigner from contribution claims and makes settlement more attractive, while we have construed the decree more narrowly based on the underlying circumstances and avoided the potentially inequitable result that might otherwise befall Akzo. As we see it, *McDermott*'s careful balancing of these competing interests lends as much support to our approach as it does to the dissent's. In *McDermott,* the Court was called upon to decide how settlement with some defendants affects the liability of other defendants who take their chances and proceed to trial. In deciding which of three rules to adopt, the Court was motivated in part by a desire to protect settling parties from further liability and thus to foster settlement, — U.S. at — — —, 114 S.Ct. at 1466–67, but in equal measure by a concern that nonsettling parties not be made to pay damages that exceed their equitable portion of the blame for the injury, *id.* at — — —, 114 S.Ct. at 1467–68. In adopting what is referred to as the "proportionate share" rule, the Court served both interests: although the nonsettling party is barred from seeking contribution against a settling party, the nonsettling party's liability for damages is limited to its equitable share of the judgment as determined at trial. *Id.* at — — —, 114 S.Ct. at 1468–70. Here, we do not have the option of capping Akzo's liability in this way. Akzo is not in the position of a party that opts not to settle and instead to take its chances at trial; it was forced to pay out long before settlement was even on the table. Having concluded that the work the EPA ordered Akzo to perform was not a "matter addressed" by the subsequent consent decree, we do not find it inequitable to permit Akzo to seek contribution from Aigner in this situation.

**15.** The dissent observes: "Akzo thinks that it has paid more than its share; for all we can tell, the Aigner parties have paid too much and Akzo too little." *Post* at 773. Quite so. But that is some-

thing to be sorted out in addressing the merits of Akzo's contribution claim. Given the procedural posture of the case, we are required to take the facts as Akzo has alleged them. *See* n. 2, *supra.*

The dissent postulates that the real solution to Akzo's dilemma lies in a suit against the government for any mistake it may have made in ordering Akzo to conduct the emergency clean-up work, an option which, in the dissent's view, obviates any need for contribution. *Post* at 773–74. That avenue of relief may be a dead end for Akzo, however. Section 106(b)(2) of CERCLA does permit a person ordered to perform removal work under section 106(a) to petition the government for reimbursement of its costs and to file suit if the request is refused, but in order to recover, the petitioner must show either that it is not liable for response costs under section 107(a) or that the order compelling the work was arbitrary and capricious or otherwise not in accordance with law. 42 U.S.C. §§ 9606(b)(2)(A)–(D), 9613(j)(3); *see Kelley v. EPA*, 15 F.3d 1100, 1103 (D.C.Cir.1994). Akzo cannot make the first showing, because it sent wastes to the Fisher–Calo site and is therefore liable for response costs under section 107(a). 42 U.S.C. § 9607(a)(3). *See* Complaint ¶ 10. Moreover, nothing in the record before us suggests that the EPA's 1988 order was arbitrary and capricious or otherwise unlawful, either in the designation of the work to be performed or in the selection of the parties who were to perform it. Thus, even if the sums Akzo spent in complying with the section 106 order were disproportionate to its measure of culpability for the contamination of the site, the statute does not necessarily permit Akzo to recover the excess from the government.[16] Only a suit for contribution against other PRPs offers the concrete prospect of making Akzo whole in this regard.

For that reason, we suspect that if we were to bar Akzo from pursuing contribution, parties who found themselves in a similar position in the future would simply exercise the intervention right granted them by section 113(i) and oppose the approval of any consent decree that might be construed to foreclose their right to contribution. *See* 42 U.S.C. § 9613(i); *United States v. Acton Corp.*, 131 F.R.D. 431 (D.N.J.1990); *but see Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 144–46 (D.Ariz.1991). Thus, we might accomplish no more than to shift the battle to a different venue.

We have no "disdain" for the contribution protection Congress has bestowed on settling parties in section 113(f)(2). *See post* at 774. We do, however, think it inconsistent with the legislature's intent to give "matters addressed" the broad sweep that the dissent proposes. Even the EPA, which stands to gain from any precedent that makes settlements more attractive, does not embrace that approach. The language of the statute, after all, does not create a blanket prohibition against all suits for contribution; the bar extends only so far as the "matters addressed" by the settlement. When the parties to the settlement have not themselves defined those matters explicitly, we believe it in keeping with congressional intent to do so with an eye to the practicalities of the situation underlying the settlement and the reasonable expectations of the settling parties.

## III. CONCLUSION

Based on the totality of the circumstances surrounding the work for which Akzo seeks contribution and the subsequent consent decree between the government and Aigner, we conclude that initial removal work that Akzo was compelled to perform was not a "matter addressed" by the consent decree but that Akzo's voluntary efforts toward long-term clean-up were. Akzo is thus entitled to seek contribution from Aigner for the former, but not the latter. The district court's judgment against Akzo and in favor of Aigner is therefore AFFIRMED IN PART and REVERSED IN

---

**16.** A district court in this circuit has suggested that the statute does permit recovery in this situation, reasoning that if the EPA has required a PRP to complete work that exceeds its potential liability, then it has acted arbitrarily or capriciously. *Employers Ins. of Wausau v. Clinton*, 848 F.Supp. 1359, at 1367–68 & n. 13 (N.D.Ill. 1994); *see also Employers Ins. of Wausau v. Browner*, 848 F.Supp. 1369, at 1377 n. 13 (N.D.Ill. 1994). Obviously, that issue is not before us now, and we do not undertake to resolve it. But this is certainly a matter on which courts might differ. *See North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1245 (7th Cir.1991). In any case, the possibility of relief by this route should not foreclose recovery by way of contribution, so long as the requirements of section 113(f) are satisfied.

PART, and the case is REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, Circuit Judge, concurring in part and dissenting in part.

The district judge who approved the consent decree concluded that this settlement resolved Aigner's liability for the entire Fisher–Calo site, activating the rule in § 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), protecting settling parties from claims for contribution. I do not believe that the judge misunderstood his own decree and therefore would affirm across the board.

Section 113(f)(2) provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

If the subjects for which Akzo claims contribution are among the "matters addressed in the settlement," then § 113(f)(2) bars the demand. Akzo performed its work on a portion of the Fisher–Calo facility known as Two–Line Road. My colleagues concede that the consent decree covers the whole site, including Two–Line Road. The covenant not to sue contained in the decree makes this doubly clear. The United States and Indiana pledge not to sue the settling defendants for "covered matters," which include "any and all claims available to the United States under Sections 106 and 107 of CERCLA ... relating to the [Fisher–Calo] Facility, and any and all claims relating to the Facility available to the State under Indiana Code 13–7–8.7 and common law nuisance."

How then can it be that Akzo's claims are *not* "matters addressed in the settlement"? The majority answers: everything is subject to "equitable" adjustments. It plucks some language from § 113(f)(1) and uses this language as a warrant to disregard the scope of the settlement. Section 113(f)(1) gives a court leeway in fixing the amount of contribution; this task is unrelated to the scope of

protection offered by the next subsection. Section 113(f)(2) serves a valuable purpose in promoting settlements. Risk that in the name of "equity" a court will disregard the actual language of the parties' bargain (on which see opinion at 766 n. 8) will lead potentially responsible parties to fight harder to avoid liability (and to pay less in settlements, reserving the residue to meet contribution claims), undermining the function of § 113(f)(2).

There is a second element to the majority's argument. The consent decree and the covenant not to sue regulate only the settling parties' liability to the United States and to Indiana. How, my colleagues ask, can language so limited extinguish claims by strangers? The answer is: Because § 113(f)(2) says so. "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." Nothing here about resolving liability to private parties; nothing here implying that the consent decree must contain a separate provision blotting out claims by private actors. Aigner fully resolved its liability to the United States. By "resolv[ing] its liability to the United States" Aigner *thereby* obtained protection from private parties' claims for contribution. *Dravo Corp. v. Zuber*, 13 F.3d 1222 (8th Cir.1994).

Finally, the majority observes that "Akzo's work stands apart in kind, context, and time from the work envisioned by the consent decree". Opinion at 767. True enough as a factual matter; the decree does not require duplicative work. Akzo performed some tasks; Aigner agreed to perform additional tasks. But why should this matter? Unless the first attempt at a cure failed, the settlement *always* will require work distinct from what has gone before. A project-by-project approach drains most meaning from § 113(f)(2). An agreement to carry out a discrete project typically comes with its own provisions for contribution and indemnity. For example, the 20 firms (including Akzo) that agreed to complete the work specified by the 1988 order also agreed to forego any contribution among themselves. The firms

that signed the consent decree of 1992 similarly abandoned claims among themselves, while preserving claims against any other firms that had not promised to pitch in. The statutory provision, then, must be designed to address contribution for projects outside the scope of the settlement—to block claims by non-parties that, as here, took part in a different project at the same site but reached a settlement covering the whole site.

Section 113(f)(2) permits the EPA to negotiate global settlements—to promise that if certain firms perform projects $A$ and $B$, they will not be liable for the costs of projects $C$ and $D$, which other persons have undertaken. The EPA's ability to make such promises gives it a valuable bargaining chip. The agency may demand that polluters do more as a condition of discharging their full responsibility. Freedom from contribution may be the key to a settlement. Consider a simple illustration. Recycling Industries has two plants, East and West. Toxic substances seep from both plants. The EPA identifies two firms that sent toxic substances to Recycling Industries. PRP #1 spends $10 million to clean up the East plant. The EPA approaches PRP #2 with a proposal that it spend $10 million to clean up the West plant. If the "matters addressed" under § 113(f)(2) are project-specific, PRP #2 would be a fool to agree. For it would spend $10 million to clean up the West plant and then be directed to pay $5 million in contribution to PRP #1 for cleaning up the East plant. Final position: PRP #1 pays $5 million, PRP #2 pays $15 million. (One cannot reply that the $5/$15 million division in this hypothetical is not "equitable" under § 113(f)(1) without abandoning the project-specific approach that the majority embraces.) To avoid this, PRP #2 will litigate to the gills and sue PRP #1 for contribution as well. Each PRP, however, will be willing to do its share, and with less litigation, if the EPA can divide the tasks, assigning one plant to each firm and using § 113(f)(2) to preclude contribution. The majority replies that its interpretation permits this happy outcome; all the parties have to do is "negotiate a global settlement encompassing both East and West plants." Opinion at 768 n. 14. But that is exactly what these parties did! Aigner and the EPA negotiated a "global settlement" covering the entire Fisher–Calo facility, and the majority says this is not enough. To drive the point home, my colleagues add that even the most explicit language is just a "factor" that does "not foreclose the fact-specific evaluation" it prefers. Opinion at 766 n. 8. Woe unto the drafters, who think their agreement counts. In *Key Tronic Corp. v. United States,* —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), a PRP deemed language equivalent to the release here, see *id.* at —— n. 1, 114 S.Ct. at 1963 n. 1, so clear that it threw in the towel, withdrawing its claim for contribution. By the majority's lights, it made a big mistake.

Consider, too, the second sentence of § 113(f)(2): "Such settlement does not discharge any other potentially liable persons unless its terms so provide". This sentence must mean that a settlement may extinguish the liability for contribution even of non-parties, firms that did not agree to do *anything.* Measuring the scope of immunity by the precise project undertaken does not look at all attractive once we recognize that Congress permitted a settlement to block contribution rights against non-parties that did not take part in any project. The "de minimis defendants" identified in the 1992 consent decree obtained exactly this protection: they chipped in a total of $11 million in exchange for protection against further claims. None of the de minimis defendants performed any work under the 1988 order. I take it as given that Akzo may not pursue them for contribution. *Dravo,* 13 F.3d at 1225–26. Yet by the majority's rationale even the de minimis defendants may be liable to Akzo. Their bargain with the EPA has been rendered illusory.

If § 113(f)(2) were nothing but a sop to a powerful interest group, then it might make sense to give it a narrow reading. The majority treats the prospect of disproportionate liability as proof that § 113(f)(2) is undesirable. When contribution is unavailable, some firms' final accounts may be disproportionate to the wrong. Yet this hardly shows a problem in the statute. The norm in federal litigation is no contribution at all. The common law rule of joint and several liability

permits victims to collect their whole loss from the wrongdoer of their choice, or in such proportions as they please from multiple offenders. The Supreme Court has been reluctant to create rights of contribution that permit these wrongdoers to collect, in turn, from other persons. See *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Firms that have incurred legal liability thus have no general right to a fair distribution of expenses.

Akzo thinks that it has paid more than its share; for all we can tell, the Aigner parties have paid too much and Akzo too little. Finding out who is "really" responsible for how much of the pollution, in order to know who should pay what to whom, could require exhaustive litigation. Section 113(f)(2) enables everyone to avoid such questions. Indeed, the main function of § 113(f)(2) is precisely that private parties' desire to avoid disproportionately large liability will lead them to settle more quickly and for larger sums. "Congress explicitly created a statutory framework that left nonsettlors at risk of bearing a disproportionate amount of liability.... Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan." *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 91–92 (1st Cir.1990). A general rule of no contribution increases the sums wrongdoers (and potential wrongdoers) will pay to resolve their liability, because a settlement buys peace. When contribution is available, in contrast, settlement is harder to achieve (and the settling parties pay less) because the resolution leaves the party exposed to further liability. See William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 201–15 (1987); Steven Shavell, *Economic Analysis of Accident Law* 164–67 (1987); Lewis A. Kornhauser & Richard L. Revesz, *Sharing Damages Among Multiple Tortfeasors,* 98 Yale L.J. 831 (1989). See also *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1314–18 (7th Cir.1992).

Statutes that create rights of contribution generally come with limitations, of which § 113(f)(2) is a good example. Section 113(f)(2) is a variant of the settlement-bar rule that many states have adopted by statute because of its potential to promote peaceful resolution of disputes. *Uniform Contribution Among Tortfeasors Act* § 4(b) (1955 rev.). Admiralty law permits contribution—but not from defendants that have settled.

[A] right of contribution against the settling defendant is clearly inferior to [other options], because it discourages settlement and leads to unnecessary ancillary litigation. It discourages settlement, because settlement can only disadvantage the settling defendant. If a defendant makes a favorable settlement, in which it pays less than the amount a court later determines is its share of liability, the other defendant (or defendants) can sue the settling defendant for contribution. The settling defendant thereby loses the benefit of its favorable settlement. In addition, the claim for contribution burdens the courts with additional litigation. The plaintiff can mitigate the adverse effect on settlement by promising to indemnify the settling defendant against contribution, .... This indemnity, while removing the disincentive to settlement, adds yet another potential burden on the courts, an indemnity action between the settling defendant and plaintiff.

*McDermott, Inc. v. AmClyde,* —— U.S. ——, ——, 114 S.Ct. 1461, 1467, 128 L.Ed.2d 148 (1994) (footnote omitted). Notwithstanding the Supreme Court's conclusion that contribution actions against parties that have settled are undesirable, the majority today goes out of its way to authorize this device. It evidently disagrees with *McDermott's* view of the effect of requiring settling parties to pay more money in contribution—a position evident not only from the use of the "equity" language in § 113(f)(1) to modify § 113(f)(2), which lacks such language, but also from the conclusion that cutting off rights of contribution is just plain bad policy. The majority believes that enforcing the statute as written "would leave firms like Akzo in an untenable position." Opinion at 768–69. This is not a good reason to bend the language of a law; it also happens to be wrong. The statute put-

ting Akzo under pressure is not § 113(f)(2) but § 106(b)(2), which postpones judicial review until after completion of the work the EPA has directed the party to undertake. If the EPA has made a mistake, the affected firm may recover from the United States, 42 U.S.C. § 9613(j)(3); it does not need a right of contribution. Indeed, if the order is mistaken, a right of contribution would do it no good. The EPA's improper order that Firm *A* undertake some project offers no warrant for shifting the costs to Firm *B*, which is equally innocent. Improper or excessively costly orders under § 106 therefore do not give rise to claims for contribution and are unaffected by § 113(f)(2).

If the EPA shares the majority's disdain for § 113(f)(2)—if like my colleagues it fears that permitting settling parties to cap their liability at the amounts they agree to pay will lead to more litigation by the first party the Agency pursues—it may adopt a policy of defining "matters addressed in the settlement" narrowly. Each settlement specifies the "matters addressed." It would have been simple to say in this settlement, for example, that work done at Two–Line Road under the 1988 order is *not* "addressed" by the 1992 settlement. But had the EPA demanded such a limitation, Aigner might have put up more defense or reduced the amount it was willing to pay. Perhaps the EPA wants an option to adopt a Janus-faced position, conveying to PRPs the impression that the settlement is comprehensive and then telling the court something different. Such a trick works only once. Having persuaded us to depart from the language of its settlement with Aigner, because formal agreements are just "circumstances" to be weighed on some conceptual scale (opinion at 766 n. 8), the EPA will have a hard time persuading other PRPs that its promises are credible—and a correspondingly hard time obtaining the maximum value in settlement.

*McDermott* shows that if Congress had not enacted § 113(f)(2), Aigner would not be liable to Akzo—for federal common law does not permit one joint tortfeasor to obtain contribution from another that has settled. I do not see how the existence of § 113(f)(2), which is designed to protect settling parties'

interest in peace, can make them worse off. Yet this is what the majority concludes.

Firms such as Akzo may find their solace in the last part of § 113(f)(2): a settlement that extinguishes rights of contribution "reduces the potential liability of the others by the amount of the settlement." They may pursue, as well, other PRPs that have not signed a settlement addressing the entire site. What Akzo may not do is wring more money from firms that have definitively settled their liability.