USCA1 Opinion

 

 yFebruary 15, 1995UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1841 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. UGO DIBIASE, ETC., ET AL., Defendants, Appellants. _________________________ ERRATA SHEET ERRATA SHEET The opinion of the Court issued on January 25, 1995, is corrected as follows: On cover sheet, line 6, change "Louis" to "Lois" UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1841 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. UGO DIBIASE, ETC., ET AL., Defendants, Appellants. __________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, U.S. District Judge] ___________________ __________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ __________________________ Stephen M. Leonard, with whom Mintz, Levin, Cohn, Ferris, ___________________ ____________________________ Glovsky & Popeo was on brief, for appellants. _______________ John E. Darling, with whom Joseph C. Correnti, Ellen M. ________________ ____________________ _________ Winkler, and Serafini, Serafini and Darling were on brief, for _______ _______________________________ defendant-appellee South Essex Sewerage Dist. Joan M. Pepin, with whom Lois J. Schiffer, Assistant _______________ __________________ Attorney General, David C. Shilton, Catherine Adams Fiske, and _________________ ______________________ Andrea Nervi Ward Attorneys, U.S. Dept. of Justice, Environment & _________________ Natural Resources Div., and John T. McNeil, Sr. Asst't Regional ______________ Counsel, U.S. Environmental Protection Agency, were on brief, for the United States. _________________________ January 25, 1995 _________________________  SELYA, Circuit Judge. The United States negotiated a SELYA, Circuit Judge. ______________ settlement with a potentially responsible party, the South Essex Sewerage District (SESD), fixing SESD's share of certain emergency removal costs incurred by the government in the cleanup of a Superfund site.1 The district court placed its imprimatur on the settlement by entering a consent decree (the SESD decree). Appellant, Ugo DiBiase, a non-settling responsible party left to hold the bag for the remainder of the emergency removal costs, prosecuted this appeal in hopes of convincing us that the consent decree is unfair. We are not persuaded. I. BACKGROUND I. BACKGROUND The Salem Acres Superfund Site (the Site) consists of five acres of undeveloped land containing wetlands and a brook, located in Salem, Massachusetts. From 1946 until 1969, James Grasso owned it. During that interval, Grasso permitted SESD to dump at the Site. SESD deposited sewerage wastes into unlined "sludge pits" which were surrounded by earthen berms and fences. SESD maintained the Site, including the berms and interior fencing, during the period that Grasso permitted it to dump there. In December of 1969, Grasso sold a large tract of land that encompassed the Site to Salem Acres, Inc., a corporation  ____________________ 1At that point in time, the emergency removal costs totalled $2,258,893. They comprised sums already spent by the United States for containment and capping work at the Site, together with interest and costs of enforcement. See 42 U.S.C. 9604, ___ 9607. 3 owned jointly by two brothers, Ugo and Elio DiBiase.2 Unaware that the property had changed hands, SESD transported a shipment of solid wastes to the sludge pits early in 1970. When appellant learned of this occurrence, he informed SESD that he would not tolerate disposal at the Site in the future. SESD refrained from further dumping. During the 1970s, appellant received correspondence from various municipal agencies, including the Board of Health and the Fire Department, expressing concern over the unrestricted access to the Site and the random dumping that was taking place. Appellant responded by erecting gates at the entrances to the property, but he did not thereafter maintain them. Consequently, intermittent dumping by unknown parties continued. Appellant claims that he had no direct knowledge of the sludge pits until 1980, when a state agency notified him that legal action would be taken unless he rectified conditions at the Site. Even when confronted with this threat, appellant failed to take meaningful action. He agreed to install new gates, but, in the end, neglected to do so. And although the earthen berms and interior fencing around the sludge pits had completely decayed,  ____________________ 2In 1982, Elio DiBiase divested himself of any beneficial interest in the property, and the corporation transferred title to the Site to DiBiase Salem Realty Trust, an entity under appellant's sole control. Hence, the defendants in the underlying action include DiBiase Salem Realty Trust; Ugo DiBiase, in his capacity as trustee; and Ugo DiBiase, individually. For ease in reference, we ignore both Elio's passing involvement and the inclusion of the trust as a defendant, and treat Ugo DiBiase as the property owner and sole appellant. 4 appellant made no discernible effort to investigate the situation or ameliorate the obvious hazards (or so the district court supportably found). In 1987, an easily foreseeable contretemps occurred. Heavy rains caused the sludge pits to overflow and release deleterious substances into the nearby wetlands (including the brook). The United States Environmental Protection Agency (EPA) reacted to the release by conducting the two emergency removal actions that underlie this appeal. After completing that work, the government sued appellant and SESD, seeking not only to recover EPA's emergency removal costs but also to secure a declaration of the defendants' liability for future cleanup costs. In due season, the district court granted the government's motion for partial summary judgment against appellant, finding him liable for past and future response costs at the Site under the Comprehensive Environmental Response, Compensation, & Liability Act (CERCLA), 42 U.S.C. 9601-9675. The government lodged a similar motion against SESD, but the district court never ruled on it. Thus, at the time it signed the consent decree, SESD remained a potentially responsible party (PRP) rather than a demonstrably responsible party (like DiBiase) whose liability had been judicially established. Throughout the proceedings, the government endeavored to arrange a global settlement. Though EPA's negotiations with appellant came to naught, its negotiations with SESD bore fruit. 5 After notice, opportunity for public comment, and an in-court hearing, the district court, over appellant's vigorous objection, entered the SESD decree on April 5, 1994. Under it, SESD agreed, inter alia, to reimburse the United States for 85% of the past _____ ____ removal costs calculated as of the settlement date. SESD's payment amounted to $1,822,775. On May 6, 1994, the district court entered judgment against appellant for $494,207, representing the unremunerated portion of the government's historic removal costs calculated as of that date.3 After the court denied DiBiase's motion for reconsideration, this appeal ensued. II. STANDARD OF REVIEW II. STANDARD OF REVIEW The legislative history of the Superfund Amendments and Reauthorization Act of 1986 (SARA), P.L. 99-499, 101 et seq., __ ____ clearly indicates that, when reviewing a proposed consent decree in the CERCLA context, a trial court does not write on a pristine page. Instead, its function is circumscribed: it must ponder the proposal only to the extent needed to "`satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve.'" United States v. _____________ Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1991) (quoting ___________________ House Report). This circumscription has important ramifications for appellate oversight. We elucidated the standard of review  ____________________ 3The amount also includes incremental interest and enforcement costs arising after the effective date of the settlement between SESD and the United States. See supra note 1. ___ _____ 6 governing the entry of CERCLA consent decrees in Cannons, and _______ reaffirmed that standard in United States v. Charles George ______________ _______________ Trucking, Inc., 34 F.3d 1081 (1st Cir. 1994). We noted that, by ______________ the time CERCLA consent decrees reach this court, they are "encased in a double layer of swaddling." In the first place, a trial court, without abdicating its responsibility to exercise independent judgment, must defer heavily to the parties' agreement and the EPA's expertise . . . . The second basis for deference is equally compelling. Because an appellate court ordinarily cannot rival a district court's mastery of a factually complex case . . . the district court's views must be accorded considerable respect. Largely in consequence of these layers of protective swaddling, an appellate tribunal may overturn a district court's decision to approve or reject the entry of a CERCLA consent decree only for manifest abuse of discretion. [In other words], the decision below stands unless the objectors can show that, in buying into [the decree], the lower court made a serious error of law or suffered a meaningful lapse of judgment. Id. at 1085 (quoting and citing Cannons, 899 F.2d at 84). It is ___ _______ this yardstick which must be used to measure the lower court's acceptance of the SESD decree. III. DISCUSSION III. DISCUSSION On appeal, DiBiase does not attack the district court's liability determination. Rather, he fires a rifle shot aimed strictly and solely at the appropriateness of the court's allocation of the emergency removal costs. The shot misses the mark. In actuality, appellant draws a bead on an even tinier target. He virtually concedes that two of the three criteria for 7 the approval of an environmental consent decree have been satisfied, and snipes only at the fairness vel non of the SESD ___ ___ decree. Moreover, while fairness in respect to CERCLA settlements has both a procedural and a substantive aspect, see ___ Cannons, 899 F.2d at 86, appellant does not train his sights on _______ any alleged procedural unfairness. Since our inquiry must be limited accordingly, the issue before us reduces to whether the SESD decree, as approved below, is substantively fair. Substantive fairness has a protean quality and, therefore, is often discussed in general terms. In Cannons, we _______ wrote: Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible. The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done . . . . Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of settling PRPs. Id. at 87 (citations omitted). Viewing the SESD decree in this ___ deferential perspective, we find EPA's rationale for the proposed allocation to be plausible, and also find the district court's endorsement of that rationale to be well within the parameters of 8 fundamental fairness. In the first instance, the allocation reflects EPA's determination that both SESD and DiBiase are legally responsible to reimburse the public fisc for the emergency removal costs. It is impossible to quarrel with this determination. SESD, though not adjudged liable, no longer contests its liability. By like token, DiBiase has not appealed the district court order adjudging him liable for the damages; and, legally, the liability of responsible parties in a CERCLA case is joint and several, see ___ O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989), cert. ______ _______ _____ denied, 493 U.S. 1071 (1990). ______ Next, the allocation fashioned by EPA reflects the agency's assessment that SESD, as the generator and transporter of most of the toxic waste dumped in the sludge pits, is chiefly responsible for the offending conditions. The consent decree recognizes this primary responsibility by assigning the lion's share of the removal costs to SESD. The flip side of the same coin is that the consent decree implicitly recognizes appellant's lesser involvement by leaving a relatively small share of the removal costs (15%) to be collected from him. The district court concluded that this apportionment is fair. The court cited its earlier judgment on liability, noted appellant's utter failure to take any action either to investigate conditions or to ameliorate danger during almost two decades of involvement in Site ownership and more than seven years of actual knowledge about the sludge pits, and specifically 9 rejected appellant's claim that he "did no wrong." Appellant importunes us to set aside the district court's order. Despite having been adjudged liable, appellant stubbornly refuses to recognize his own culpability and maintains that it is unfair to expect him to bear any of the removal costs. His importuning ___ fails for no fewer than five reasons. In the first place, appellant does not cite and we have been unable to locate any CERCLA case in which a demonstrably liable party has been held entitled to safe passage ______ in a global settlement. We think it is counterintuitive to suppose that any such entitlement exists. Second, and relatedly, we regard appellant's argument as a surreptitious attempt to relitigate his "innocent landowner" defense, see 42 U.S.C. 9607(b)(3) (exonerating PRPs who ___ "exercised due care" and can demonstrate, inter alia, that a _____ ____ release was caused "solely" by a third party's act or omission); see also Westwood Pharmaceuticals, Inc. v. National Fuel Gas ___ ____ ________________________________ __________________ Distrib'n Corp., 964 F.2d 85, 89-91 (2d Cir. 1992) (discussing _______________ operation of innocent landowner defense),4 rejected by the  ____________________ 4For purposes of this statutory provision, a PRP is responsible for the acts and omissions of his employees, agents, or other persons who have a "contractual relationship" with him. 42 U.S.C. 9607(b)(3). The term "contractual relationship" includes relationships involving "land contracts, deeds, or other instruments transferring title," 42 U.S.C. 9601(35), subject to certain exceptions. One such exception is for innocent landowners, that is, acquirers of land who, having made "all appropriate inquiry" into the condition of the property at the time of acquisition, id. 9601(35)(B), nevertheless "had no ___ reason to know" that any environmental problem might exist, id.  ___ 9601(35)(A). 10 district court when it granted the government's motion for partial summary judgment. We have no warrant to entertain a collateral attack on that judgment. It follows that, as a party jointly and severally liable for payment of all the emergency removal costs, appellant cannot reasonably expect others to foot the entire bill. In the third place, the allocation proposed by EPA and ratified by Judge Mazzone does not strike us as either substantially disproportionate or manifestly unfair. To be sure, SESD played a leading role in the contamination of the Site and appellant, who came on the scene later, played an appreciably less prominent role. But, an actor cast in a bit part is not to be confused with a mere spectator, whose only involvement is to lounge in the audience and watch events unfold. Appellant contributed to the 1987 incident in a variety of ways. Despite being warned of a potentially dangerous condition, he twiddled his thumbs: he failed to safeguard the Site, thus permitting third parties to dump at will and exacerbate an already parlous situation; fiddled while the earthen berms deteriorated; and turned a blind eye to evolving public health and safety concerns. Allocating 15% of the historic removal costs as appellant's share seems commensurate with these shortcomings and with the quantum of comparative fault fairly ascribable to him. Fourth, appellant's concept which seems to be that liable parties should go scot free in environmental cases if other parties are considerably more culpable runs at cross- 11 purposes with CERCLA's policy of encouraging settlements as opposed to endless court battles. See H.R. Rep. No. 253, 99th ___ Cong., 1st Sess., pt. 5, at 58-59 (1985), reprinted in 1986 _________ __ U.S.C.C.A.N. 3124, 3181-82; see also United Technologies Corp. v. ___ ____ _________________________ Browning-Ferris Indus., Inc., 33 F.3d 96, 102-03 (1st Cir. 1994) ____________________________ (explaining the interface between settlement and liability). Such settlements reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites. In most instances, settlement requires compromise. Thus, it makes sense for the government, when negotiating, to give a PRP a discount on its maximum potential liability as an incentive to settle. Indeed, the statutory scheme contemplates that those who are slow to settle ought to bear the risk of paying more if they are eventually found liable. See 42 U.S.C.  ___ 9613(f)(2) - (3); see also Cannons, 899 F.2d at 91-92. Congress ___ ____ _______ apparently thought that paradigm fair, and so do we. This case illustrates the point. The government gave SESD a 15% discount on its maximum potential exposure. This proved to be a sufficient incentive to achieve a settlement, despite the fact that SESD's liability had not yet been adjudicated. Appellant who, unlike SESD, already had been found liable received ample opportunities to buy peace, but took no advantage of them. Against this unsympathetic backdrop, appellant cannot rewardingly complain that he must now shoulder a 12 larger share of the overall expense than might have been the case if he had moved faster or if SESD had proven intransigent. Fifth, and last, fairness rarely can be described in absolute terms. There is no litmus test for it and no one allocation that will, in a CERCLA case, comprise the only fair allocation. Rather, fairness is a mutable construct that "tak[es] on different forms and shapes in different factual settings." Cannons, 899 F.2d at 85. Absent a mistake of law  _______ and we see none here this reality, coupled with the twice- insulated deference afforded CERCLA consent decrees, see Charles ___ _______ George Trucking, 34 F.3d at 1085; Cannons, 899 F.2d at 84, places _______________ _______ a heavy burden on an objector who strives to convince an appellate court that error inheres in the entry of such a decree.5 In this case, the burden has not been carried. Judge Mazzone's finding that the SESD decree falls within the wide universe of fair solutions is abundantly supported. IV. CONCLUSION IV. CONCLUSION We need go no further.6 Because appellant has neither  ____________________ 5This burden is particularly weighty when the district judge is called upon to assess the comparative fault of different classes of PRPs. So it is here. The court below had to contrast the fault ascribable to a generator and transporter (SESD) with the fault ascribable to a landowner (DiBiase). In such circumstances, the trial judge is in effect forced to compare apples with oranges. Accordingly, his prolonged exposure to the litigation and his firsthand knowledge of the case's nuances become extremely important, heightening the need for deference. 6This appeal presents no issues anent cleanup costs over and above the emergency removal costs. The parties informed us at oral argument that all issues of that nature have been resolved amicably. 13 offered any compelling reason to brand the consent decree unfair nor persuaded us that the district court blundered in approving it, his appeal falters. Affirmed. Affirmed. ________ 14