United States Court of Appeals
For the First Circuit


No. 95-1961
No. 95-1984
No. 95-2019
UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

CHARTER INTERNATIONAL OIL COMPANY,

Defendant, Appellant.



ACUSHNET COMPANY, ET AL.,

Proposed Intervenors-Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge] 



Before

Cyr, Boudin, and Lynch, Circuit Judges. 



David B. Broughel, with whom Jeffrey B. Renton, and Day, Berry & 
Howard were on brief, for appellant, Charter International Oil 
Company.

David M. Jones, with whom Roger C. Zehntner, Irene C. Freidel, 
Phoebe S. Gallagher and Kirkpatrick & Lockhart were on brief, for 
proposed intervenors-appellees, Acushnet et al.

Evelyn S. Ying, Attorney, United States Department of Justice, 
with whom Lois J. Schiffer, Assistant Attorney General, Daniel C. 
Beckhard and David C. Shilton, Attorneys, United States Department of 
Justice, were on brief, for the United States as appellee.



May 9, 1996


LYNCH, Circuit Judge. The clean-up of a Superfund LYNCH, Circuit Judge. 

hazardous waste site in New Bedford, Massachusetts is largely

being accomplished and funded through agreements the

government has reached with private parties who bear some

legal responsibility for the wastes at the site. Those

agreements, by law, must be approved by the United States

Courts as being fair, reasonable, and consistent with the

purposes of CERCLA, the Comprehensive Environmental Response,

Compensation and Liability Act. Multiples of millions of

dollars are involved in these settlements and the stakes are

high, both for the public and for the parties involved. The

allocation of responsibility for payment of those millions --

as between the public treasury and the private sector and

amongst the private players themselves -- has given rise to

complicated settlement dynamics. Those settlements are

subject to both the court approval mechanism enacted by

Congress and to specific statutory clauses providing for (and

protecting against) contribution by some of the potentially

responsible parties ("PRPs") to the settlement sums paid by

other such parties.

The question presented here is whether the district

court abused its discretion in approving a CERCLA consent

decree between the government and Charter International Oil

Company arising out of the Sullivan's Ledge Superfund Site.

What is unusual is that the government and Charter disagreed

-2- 2

in a very fundamental sense on interpretation of the consent

decree. This, in turn, raises the issue of the extent to

which the scope of "matters addressed" in the decree, an

issue usually resolved in separate contribution actions, was

required to be determined by the district court in its

approval of the consent decree.

Under the rubric of approval of the decree, two sets

of private parties here attempt to battle out the ultimate

allocation of contribution liability in a clean-up with costs

estimated to be in the order of $50 million. Charter urges

that the district court erred in rejecting its

interpretation, which would give Charter complete

contribution protection against prior settlors for its

payment of $215,000 plus interest. The Acushnet Group,

comprised of prior settling parties who have instituted such

a contribution action against Charter, urges that the

district court erred in not resolving all contribution

questions in the course of approving the decree.

We affirm the district court's order.

The Sullivan's Ledge Superfund Site 

An old granite quarry in New Bedford was used as a

waste disposal area by the city from 1935 to the 1970s.

Local industries disposed of their wastes, including

hazardous substances, into four pits, extending as deep into

the bedrock as 150 feet. The contaminants from the wastes

-3- 3

spread to adjacent areas, including some wetlands known as

Middle Marsh.

In 1984, the EPA placed the area, known as the

Sullivan's Ledge Site, on the National Priorities List. See 

40 C.F.R. Pt. 300, App. B. It began its Remedial

Investigation and Feasibility Study of the two "operable

units" on the Site: the entire Site save for the Middle Marsh

("first unit") and the Middle Marsh ("second unit"). The EPA

found significant hazardous substances in the groundwater,

soils, and sediments of both units.

In June 1989 EPA issued its Record of Decision ("ROD

I") as to the first unit, calling for excavation of

contaminated soils and sediments, construction of an

impermeable cap over the disposal area, groundwater treatment

and wetlands remediation. The government sued fourteen PRPs

with respect to the first unit (the Acushnet Group), who

settled. See United States v. Acushnet Co., Civ. No. 91- 

10706-K (D. Mass.). The district court entered a consent

decree approving and finalizing the settlement (the "1991

Decree"). 

Under the terms of the 1991 Decree, the Acushnet

Group paid $620,000 to the government for past costs incurred

in connection with ROD I. The Group also agreed to perform

the ROD I remedy, including the first thirty years of

operation and maintenance, and to pay all of the EPA's

-4- 4

oversight costs for the first five years and half of its

oversight costs through the thirtieth year.

On September 27, 1991, after completing its study of

the contamination in the Middle Marsh wetlands area, the EPA

issued its remedy for the second unit ("ROD II"). On April

26, 1993, the district court entered a consent decree

approving the settlement between the government and fifteen

PRPs (the Acushnet Group and the City of New Bedford).

United States v. AVX Corp., Civ. No. 93-10104-K (D. Mass.) 

(the "1993 Decree"). The 1993 settlors agreed to perform the

remedy set forth in ROD II and to pay half of the EPA's

oversight costs with respect to the second unit.

Charter was offered the opportunity to participate in

the 1991 Decree but declined it, saying that the price tag

was too high for what it believed its liability to be. The

parties to both the 1991 and 1993 Decrees understood that the

government had a larger total claim relating to the Site than

the recovery it had obtained from the initial settlors and

that the government planned to seek further recovery from

parties who had not yet settled. That is exactly what the

government did, bringing a series of lawsuits against non-

settling PRPs,1 including suit against Charter.

 

1. The government brought a cost recovery suit for its
shortfall on the first unit against two non-settlors. United 
States v. Cornell-Dubilier Electronics, Inc., Civ. No. 92- 
11865-K (D. Mass.). The initial Cornell-Dubilier complaint 
sought approximately $2.8 million and a declaratory judgment

-5- 5

Proceedings Against Charter 

The government pursued Charter under a theory of

successor liability for a company, Pacific Oil, which had

dumped soot from oil burners into the Sullivan's Ledge

landfill.2 In June 1992 the government initiated

independent settlement negotiations with Charter. On

December 2, 1993, the proposed consent decree was lodged in

the district court and notice was published in the Federal

Register.3 58 Fed. Reg. 65,397 (Dec. 14, 1993). In

 

that the defendants were liable for the government's future
response costs not covered by the 1991 Decree. After entry
of the 1993 Decree, the government amended its Cornell- 
Dubilier complaint, adding three new defendants and seeking 
an additional $1 million for costs relating to the second
unit. The City of New Bedford, a defendant in Cornell- 
Dubilier, has agreed to a proposed decree for unrecovered 
costs from the first unit in satisfaction of the claims
asserted against it in the Cornell-Dubilier suit. 
Similarly, seeking to recover its claims against parties
not settling in the initial rounds, the Acushnet Group filed
suit against twelve parties, excluding Charter. See Acushnet 
Co. v. Coaters, Inc., Civ. No. 93-11219-K (D. Mass.). 

2. Charter disputes the contention that the soot contained
high concentration levels of hazardous substances. Further,
there were two companies that used the name "Pacific Oil":
Durfee Fuels, a Massachusetts corporation and Pacific Oil
Company, a Rhode Island corporation. Charter claims that it
was Durfee Fuels (to which it was not a successor) and not
the Pacific Oil Company (to which it was) that dumped the
soot. 

3. Section 122(d)(2) of CERCLA requires the Attorney General
to provide persons who are not parties to a proposed consent
decree an opportunity to comment on the proposed consent
decree "before its entry by the court as a final judgment."
42 U.S.C. 9622(d)(2)(B). Further, the Attorney General is
obligated to "consider, and file with the court, any written
comments, views, or allegations relating to the proposed

-6- 6

response, the Acushnet Group filed comments voicing its

concern that the decree might be interpreted to afford

Charter contribution protection against the claims of

settlors in the 1991 and 1993 Decrees. Charter responded in

turn, asserting that the prior settlors' contribution claims

against it were indeed impaired by the decree. In August

1994, the government made it clear to Charter that its

position was that the decree did not grant Charter complete 

contribution protection against the claims of prior settlors

and that it would press this interpretation with the court.

Given their differing interpretations of the decree, the

government offered to let Charter withdraw, but Charter

declined.

On February 2, 1995, the government moved for entry

of the Charter consent decree. It presented to the district

court its position that the decree did not provide Charter

with complete contribution protection against prior settlors.

The district court consolidated the consent decree action and

the contribution action filed by the Acushnet Group against

Charter for the limited purpose of conducting a hearing to

determine the impact of the contribution protection issue on

entry of the decree. The Acushnet Group objected in the

government's case to entry of the decree, but only if the

 

judgment." Id.  

-7- 7

decree were interpreted to provide Charter with complete

contribution protection.4

At the consolidated hearing, the court heard

arguments on the proper interpretation of the decree. It

gave Charter another opportunity to withdraw from the decree,

but Charter again declined. The district court entered the

decree, rejecting Charter's assertion that the decree

afforded it complete contribution protection against prior

settlors. The Acushnet Group's contribution action against

Charter is currently pending before the district court. See 

Acushnet Co. v. Charter Int'l Oil, Civ. No. 94-10989-REK (D. 

Mass.). 

The Consent Decree on Appeal 

Two questions are raised by this appeal. The first

is whether the district court abused its discretion in

approving the consent decree.5 See United States v. 

DiBiase, 45 F.3d 541, 544 (1st Cir. 1995). The second is 

whether its interpretation of the decree was correct, a

question which, to the extent it involves issues of law,

 

4. Charter's answer to the Acushnet Group's complaint in
contribution asserted that the claims were barred because the
proposed decree between Charter and the government would
provide full contribution protection to Charter under Section
113(f)(2) of CERCLA, 42 U.S.C. 9613(f)(2). 

5. Although jurisdictional issues over the Acushnet
Group's proposed "intervention" in this appeal lurk in the
background, we need not resolve them since the Group's
challenge fails on the merits. See Menorah Ins. Co. v. INX 
Reins. Corp., 72 F.3d 218, 223 n.9 (1st Cir. 1995).  

-8- 8

calls for fuller appellate review. See AMF, Inc. v. Jewett, 

711 F.2d 1096, 1100-01 (1st Cir. 1983). On the facts of this

case, the first question cannot be answered without

addressing the second.

In approving a consent decree, the district court

must determine three things: that the decree is fair, that

it is reasonable, and that it is faithful to the purposes

that CERCLA is intended to serve. DiBiase, 45 F.3d at 543; 

United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st 

Cir. 1990). This assessment entails, in part, an appraisal

of what the government is being given by the PRP relative to

what the PRP is receiving. What is being given by the PRP is

clear: $215,000 plus interest. It is what is being received

which implicates the district court's interpretation of the

decree and the issue of contribution protection.

We turn to the statutory scheme. In enacting the

1986 amendments to CERCLA known as SARA (the Superfund

Amendments and Reauthorization Act of 1986), Congress

provided settling parties with certain immunity from later

contribution actions arising from "matters addressed" in the

consent decree. Cannons, 899 F.2d at 91; 42 U.S.C.  

9613(f)(2). As to such matters, "only the amount of the

settlement -- not the pro rata share attributable to the 

settling party -- [is] subtracted from the liability of the

non settlors." Cannons, 899 F.2d at 91. 

-9- 9

Thus, because approval of a consent decree under

CERCLA results in contribution protection to the settling

party, it also affects the rights of PRPs who are not parties

to the decree. The contribution issue, in turn, depends on

the scope of "matters addressed" in the settlement, for:

A person who has resolved its liability to
the United States . . . in a judicially
approved settlement shall not be liable for
claims for contribution regarding matters 
addressed in the settlement. Such settlement 
does not discharge any of the other
potentially liable persons unless its terms
so provide, but it reduces the potential
liability of the others by the amount of the
settlement.

42 U.S.C. 9613(f)(2) (emphasis added).

This statutory framework contemplates that PRPs who

do not join in a first-round settlement will be left with the

risk of bearing a disproportionate share of liability.

"Disproportionate liability, a technique which promotes early

settlements and deters litigation for litigation's sake, is

an integral part of the statutory plan." Cannons, 899 F.2d 

at 92.

Further, the legislative history of SARA shows that

Congress contemplated that there would be partial settlements

which would leave settling parties liable for matters not

addressed in the agreement:

This protection attaches only to matters that
the settling party has resolved with the
[government]. Thus, in cases of partial
settlements where, for example, a party has
settled with the [government] for a surface

-10- 10

clean up, the settling party shall not be
subject to any contribution claim for the
surface clean up by any party. The settlor
may, however, remain liable in such instances
for other clean up action or costs not
addressed by the settlement such as, in this
example, a subsurface clean up.

Statement of Senator Stafford (sponsor of S. 51, the Senate

bill for the 1986 SARA Amendments), 131 Cong. Rec. 24,450

(1985).

Here, two groups are settlors and each seeks, on

opposite sides of the coin, the value of the contribution

proviso. The Acushnet Group, which settled earlier, wants

its contribution rights against Charter arising from the

Sullivan's Ledge Site clean-up maximized. Charter, a later

settlor, wants to cut off all contribution claims against it.

For purposes of establishing the scope of contribution

protection afforded to Charter by the decree under 42 U.S.C.

9613(f)(2), it would be necessary to determine the scope of

"matters addressed" by the decree.

This case, however, involves approval of a consent

decree and is not a suit for contribution. The district

court believed, as do we, that it was required to resolve

only certain aspects of the dispute over "matters addressed"

in order to fulfill its responsibilities in evaluating the

consent decree. Not every aspect of interpretation of a

consent decree (or even the precise contours of "matters

addressed") need be resolved in the course of approval of the

-11- 11

decree.6 Rather, the court must address so much of the

interpretation of the consent decree as needed to rule on the

decree's fairness, reasonableness and fidelity to the

statute.7 See United States v. Charles George Trucking, 

Inc., 34 F.3d 1081, 1088-89 (1st Cir. 1994). There may be 

prudential reasons, as this case demonstrates, not to resolve

more as to "matters addressed" than is necessary. Such

reasons, for example, may be related to uncertainty as to the

specific fact situations in which contribution claims may

arise or to the absence of parties whose interests may be

affected.8 As Aristotle noted, wisdom does not seek for

 

6. For example, in order to achieve an agreement the parties
may, on relatively minor matters, engage in purposeful
ambiguity, leaving to another day a battle which may never
need to be fought. If that ambiguity is not material to the
tripartite test for approving a consent decree, it would not
be necessary to resolve it. Perforce, it may be preferable
to leave it unresolved.

7. Although the option was open to it, the district court
chose not to consolidate the approval of the consent decree
and the contribution action, for all purposes. District
courts may find such a consolidation useful, if the cases so
warrant, to expedite and clarify matters. But they are not
required to do so. See Fed. R. Civ. P. 42(a); 9 Moore's 
Federal Practice 42.02.  

8. The arguments of the Acushnet Group and Charter, that the
district court was required to determine in the course of
approving the consent decree all aspects of all possible
contribution claims, prove too much. The district court
noted that "[t]o the extent that there is uncertainty about
the precise implication" that the settlement agreement may
have, "it may be necessary in later proceedings for this or
another court to interpret both the statute and the
agreement." It would have been premature for the district
court to issue a broad order without specific facts on which
to base its ruling. Cf. Charles George Trucking, 34 F.3d at 

-12- 12

greater precision than the nature of the subject admits.

Aristotle, Nicomachean Ethics I.3, 1094b23-28 (Martin Ostwald 

ed. & trans., 1962).

Interpretation of the Decree 

We dispose first of an initial argument. The United

States urges that, by consenting to entry of the decree,

Charter has waived its right to challenge the district

court's interpretation of the decree. We disagree. "[I]t is 

possible for a party to consent to a judgment and still

preserve his right to appeal," so long as he "reserve[s] that

right unequivocally." Coughlin v. Regan, 768 F.2d 468, 470 

(1st Cir. 1985). Charter's Notice of Objection makes clear

that it objected to, and intended to preserve its right to

appeal, any interpretation of the decree that afforded it

less than full protection against contribution claims arising

out of the Sullivan's Ledge Site. That suffices.

Charter says the decree must be interpreted so that

the "matters addressed" by it encompass all aspects of the

clean-up and remediation of the Sullivan's Ledge Site,

including all "matters addressed" in the 1991 and 1993

Decrees. Charter argues, consequently, that it cannot be

reached for contribution at all. The government says that

 

1088. The district court was also appropriately concerned
that not all potentially affected parties were before it.
The district court did what was necessary in order to decide
the issues on approval of the decree and it was certainly not
error to go no further.

-13- 13

the "matters addressed" in the Charter decree do not include

the clean-up work that the prior settlors are performing

under their consent decrees. Therefore, it asserts that the

Charter decree does not cut off completely the contribution

rights of prior settling parties against Charter under

Section 113(f) of CERCLA for costs of remediation of the

Site. The government further says that the "matters

addressed" in the consent decree encompass only the

government's "remainder" case against Charter for that

portion of the overall site liability that was not addressed

in the prior settlements, i.e., the government's claim for 

the past and future response costs that were not reimbursed

or covered by the prior settlements and for implementation of

those aspects of RODs I and II that are not performed by the

prior settlors.

The district court did rule on this dispute as to

"matters addressed," and ruled against Charter. It left

other aspects to be resolved in the parallel contribution

action brought by the Acushnet Group against Charter. 

In reviewing the district court's ruling on the

"matters addressed" by the decree we look to the decree's

"four corners." See United States v. Armour & Co., 402 U.S. 

673, 681-82 (1971). In United States v. ITT Continental 

Baking Co., 420 U.S. 223 (1975), the Court expounded on the 

"four corners" rule of Armour: 

-14- 14

Since a consent decree or order is to be
construed for enforcement purposes basically
as a contract, reliance upon certain aids to
construction is proper, as with any contract.
Such aids include the circumstances
surrounding the formation of the consent
order, any technical meaning words used may
have had to the parties, and any other
documents expressly incorporated in the
decree.

Id. at 238. 

The district court held that it would not interpret

the decree as Charter contended and that such an

interpretation "would be extreme in its consequence as to

what the government gave up compared with the

disproportionately small cash sum the government received in

return." It further stated that such an interpretation would

be "disapproved as contrary to the public interest."

The determination of interpretation of the decree is

iterative and proceeds incrementally, as in most areas of

law, with priorities for reaching different levels of

analysis. Cf. Lomas Mortgage, Inc., v. Louis, No. 95-1956, 

F.3d , , slip op. at 9-10 (1st Cir. 1996) (statutory

interpretation starts with the plain meaning of the statute,

but where the statute is ambiguous, legislative history may

be considered); Massachusetts v. Blackstone Valley Elec. Co., 

67 F.3d 981, 987 (1st Cir. 1995) (same). As in most contract

interpretation questions, we start here with the text. See 

Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st 

Cir. 1989).

-15- 15

Unfortunately, apparently due to EPA policy at the

time,9 there is no explicit "matters addressed" clause in

the agreement. Charter argues that, nonetheless, the

district court should have interpreted "matters addressed"

broadly in light of the contribution protection and covenant

not to sue clauses of the agreement, as well as extrinsic

evidence, particularly of the parties' negotiating history.

In the absence of explicit language, the parties

agree, citing to contribution cases from other circuits, one

must first look elsewhere to determine "matters addressed."

Different circuits have taken somewhat different approaches.

In Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761 (7th Cir. 

1994), the Seventh Circuit started with the decree itself,

and, in the absence of an express "matters addressed" clause

looked to various factors including "the particular location,

time frame, hazardous substances, and clean-up costs covered

by the agreement." Id. at 766. That court recognized, over 

a dissent, that its "flexible, fact-based approach" would not

offer the "settling parties the same degree of repose as one

 

9. The absence of specific language concerning "matters
addressed" might be thought to be of concern to the EPA and
the public. Having the scope of "matters addressed"
specifically agreed upon should lead to greater certainty and
finality. That certainty and finality are attractive
inducements to settle. The uncertainty and continuing
litigation which this case exemplifies could reasonably be
thought to be a deterrent to others to settle with the
government. Charter advises us that the EPA, in 1995,
changed its policy to require that "matters addressed" be
specified. 

-16- 16

based solely on the facial breadth of the decree." Id. at 

767-68. The dissent preferred a broader reading, reasoning

that more comprehensive contribution protection would lead to

more settlements. See id. at 773 (Easterbrook, J., 

dissenting). The Tenth Circuit in United States v. Colorado 

& Eastern R.R. Co., 50 F.3d 1530, 1538 (10th Cir. 1995), took 

a related "fact-specific approach," laying the earlier and

the later "consent decrees [and their

attachments] . . . . side by side and comparing the matters

covered in relation to the remediation completed . . . . at

the date of the [second] consent decree."

We reject any argument that Section 113(f)(2)

itself warrants a broad understanding of "matters addressed"

by the decree, just as Colorado & Eastern, 50 F.3d at 1537- 

38, and Akzo, 30 F.3d at 765, 770, rejected this argument. 

The statute does not dictate any particular method for

assessing the scope of the decree. See Akzo, 30 F.3d at 765. 

Thus, the district court appropriately rejected Charter's

argument based on paragraph 16 of the proposed decree, which

provides:

With regard to claims for contribution
against [Charter] for matters addressed in
this Consent Decree the parties hereto agree
that [Charter] is entitled to such protection
from contribution actions or claims as is
provided by CERCLA Section 113(f)(2), 42
U.S.C. 9613(f)(2).

-17- 17

This language simply repeats the statutory contribution

language of Section 113(f)(2), without defining "matters

addressed." Charter says that this language in the decree

would be meaningless unless its interpretation is adopted.

That is not so. The language may provide protection to

Charter should the government later recover from other

parties a part of its claim. 

We confine ourselves to the text of the decree and

find the answer there, thus not reaching the issue of what

other interpretive guides, if any, are permissible under

CERCLA. We are unpersuaded by Charter's argument that the

text of the decree supports its reading. We believe that the

text of the decree as to: (i) the scope of the claims

purported to be brought and settled; (ii) the definition of

the response costs being reimbursed by the settlement; and

(iii) the explicit references to the prior decrees,

forecloses Charter's interpretation.

Charter relies heavily on the decree's covenant not

to sue clause, which prevents the government from suing

Charter "pursuant to Sections 106 and 107(a) of CERCLA and

Section 7003 of RCRA relating to the Site, including for

reimbursement of Response costs or for implementation of ROD

I or ROD II." But that the government has promised not to

sue Charter says nothing about the intention as to whether

other, prior settling parties were to have their rights of

-18- 18

contribution against Charter extinguished by this agreement.

The one does not necessarily follow from the other.

Untoward and congressionally unintended consequences

would flow from Charter's reading. As the Seventh Circuit

observed in Akzo: 

If the covenant not to sue alone were held to
be determinative of the scope of contribution
protection, the United States would not be
free to release settling parties from further
litigation with the United States, without
unavoidably cutting off all private party
claims for response costs.

30 F.3d at 766 (quoting brief of United States as amicus).
We agree. The government may have reasons to give such a

covenant unrelated to an intent to grant broad contribution

protection against prior settlors.

We find dispositive instead the text of the decree

establishing that Charter was sued on the government's

remainder case, that the government sought and Charter agreed

to reimburse the government for its response costs as to that

remainder case, and that the remainder case was defined

against the backdrop of the prior settlements.

The text describing the scope of the claims to be

brought and settled undermines Charter's proposed

interpretation:

The United States in its complaint seeks
reimbursement of response costs incurred and
to be incurred by EPA and the Department of
Justice for response actions in connection
with the release or threatened release of
hazardous substances at the Sullivan's Ledge
Superfund Site in New Bedford, Bristol

-19- 19

County, Massachusetts . . . and a declaration
of the defendants' liability for further
response costs.

Neither the complaint nor the decree asserts a claim against

Charter for the remediation work being done by the Acushnet

Group. A reading of a decree which far exceeds the relief

sought by plaintiffs' complaint would be strained and

doubtful. See Navarro-Ayala v. Hernandez-Colon, 951 F.2d 

1325, 1341 (1st Cir. 1991). Even crediting the argument that

some settlements may exceed the boundaries of claims made in

the complaint,10 there is nothing in this decree to lead to

that result.11

 

10. Cf. Charles George Trucking, 34 F.3d at 1090 (consent 
decree may resolve claims for damages not pleaded
specifically, if the parties so intend, so long as the claims
are within the general scope of the pleadings).

11. We note the potential problem of the government not
honoring its agreement with prior settlors by collusively
agreeing with subsequent settlors on language in their
agreement broader than the claims the government made against
those subsequent settlors. Cf. Akzo, 30 F.3d at 774 
(Easterbrook, J., dissenting) (making an analogous point
about the government inducing PRPs to enter large settlements
with promises of broad contribution protection and then later
urging the district court to arrive at a narrow reading).
That is not this case. The district court here expressed its
skepticism that the earlier settlement empowered the
government to do whatever it wished about impairing the
contribution rights that were retained by the prior settling
parties. The government has expressly disavowed any such
intention.
In addition, the government has a serious disincentive
to collude with later settlors to cut off the rights of prior
settlors just to extract a higher second-round settlement in
a single clean-up proceeding. It is the government that is
the repeat player in the world of CERCLA clean-ups. Should 
the government develop a reputation for cheating early
settlors, that would deter settlements in later clean-ups

-20- 20

The definition of response costs in the decree also

does not support Charter's interpretation. The decree

defines Charter's $215,000 payment as being "in reimbursement

of Response Costs," which are defined as the government's 

response costs. The decree says "the United States has

incurred, and will continue to incur, response costs which

have not been recovered under the 1991 Consent Decree or the

1993 Consent Decree." The decree estimates the government's

shortfall to exceed $4 million in such response costs. The

decree also indicates that the government evaluated the

$215,000 to be paid by Charter in terms of these unrecovered

costs of at least $4 million and the risk that some

remediation work may not be completed by other settlors. The

amount was not evaluated against the total costs of clean-up

at the Sullivan's Ledge Site. 

Further, as the government points out, the Charter

decree explicitly refers to the earlier decrees. In the

prior settlements the Acushnet Group did not give up the

right to seek contribution from those who were not part of

those settlements. The prior settlements are explicitly

referenced and described in the Charter decree. Under such

circumstances we may consider these prior settlements in

interpreting the decree. Cf. ITT Continental Baking, 420 

 

(and reduce the amounts early-round settlors are willing to
pay) and hence, in the long run, hurt the government's
interests.

-21- 21

U.S. at 238. In light of these considerations, we hold that

the text of the decree supports the government's

interpretation and not Charter's and so affirm the district

court's ruling on this point.

Charter argues that the decree is ambiguous and that

extrinsic evidence of the negotiating history of the parties

demonstrates that Charter was intended to be protected from

all contribution claims. Cf. Thomas Hobbes, Leviathan Ch. XI, 

at 84 (Michael Oakeshott ed. 1962) (1651) (men call

indeterminate that which they wish to contest because they

have interests at stake). While in routine contract

interpretation extrinsic evidence may be considered when the

disputed terms are ambiguous, we do not find the decree

ambiguous, and such evidence may not be considered to

contradict the written terms of the agreement. See Brennan 

v. Carvel Corp., 929 F.2d 801, 808 (1st Cir. 1991). 

Even so, we doubt, but do not decide, whether in

interpreting a CERCLA consent decree it would be appropriate

to rely on the type of extrinsic evidence Charter proffers.

This court has at times considered certain types of extrinsic

evidence in interpreting decrees in public institution civil

rights actions. See Navarro-Ayola, 951 F.2d at 1343. But 

CERCLA settlements, unlike ordinary contract formation, take

place in a unique statutory framework. That framework

requires that before a decree is entered by the court, notice

-22- 22

of the decree be published, there be an opportunity for

public comment, and that the Attorney General take account of

the commentary and reserve the right to withhold consent

should the commentary show the decree to be inappropriate.

42 U.S.C. 9622(d)(2). That public comment is part of the

record before the district court. Id. The statutory 

structure thus assumes that the public will be given access

to the relevant documentary information on the decree. The

evidence of the negotiating history which Charter proffered

was not within the information the public had available.12

It is worth asking why the court should enter a

consent decree when there was a fundamental dispute over the

effect of the decree. There are two responses. The first is

that Charter expressed its intent to live with whatever

interpretation the court ultimately gave the decree. There is

no unfairness to Charter. When Charter said that it had not

understood the government's position to be that Charter would

not be afforded complete contribution protection, the

government offered to allow Charter to withdraw from the

agreement. Charter declined. Charter knew the government

would present a contrary interpretation to the district

 

12. Even were we to adopt Charter's method of analysis, we
see nothing in the negotiating materials that indicates that
the government intended to undercut its earlier settlements
with the Acushnet Group or that it ever agreed with Charter's
view on the scope of contribution protection afforded by the
decree. 

-23- 23

court. Charter also knew that courts are required to give

some deference to the judgment of the Attorney General that

the settlement is appropriate.13 Charles George Trucking, 

34 F.3d at 1085. In addition, the district court gave

Charter the opportunity to withdraw from the settlement in

the face of a contrary government position and the court's

statement that it would most likely rule against Charter's

interpretation. Charter again declined. Counsel for Charter

informed the court that, win or lose in its interpretation of

the decree, Charter preferred to have an agreement with the

government. Such an agreement, Charter acknowledged, would

both provide it with some contribution protection and get it

out of costly litigation with the government. Indeed, on

appeal, Charter does not ask us to vacate the decree. Rather

its position is that the decree should be upheld and that its

interpretation should be substituted for that of the district

court.

Second, while a different case might lead to a

different result, we think that the policies behind CERCLA

are better served here by holding Charter to the consequences

of its roll of the dice. Perhaps mindful of the huge

 

13. We reject the Acushnet Group's argument that the
district court is required to defer to the Attorney General's
judgment to the extent of exercising no independent judgment
of its own. See Charles George Trucking, 34 F.3d at 1085 
(although in entering a decree a district court must defer to
the EPA's judgment and to the parties' agreement, it has a
responsibility to exercise its independent judgment).

-24- 24

resources going into the transactions costs of CERCLA

litigation, rather than to remediating the sites,14

Congress sought in SARA to encourage earlier resolutions by

agreement. See United States v. SCA Servs. of Ind., Inc., 

827 F. Supp. 526, 530-31 (N.D. Ind. 1993). If a party were

permitted to use the consent decree process to delay, whether

in good faith or by design, and then to undo a decree by

saying its understanding of the base terms was different,

then the congressional purposes would be undercut. Cf. 

Menorah, 72 F.3d at 223. Given that Charter voluntarily 

chose to consent to the decree, despite the significant risk

of an interpretation contrary to its interests, it was not

unreasonable for the district court to have entered the

decree.

Approval of the Consent Decree 

There was no abuse of discretion by the district

court in approving the decree, as based on the government's

 

14. See Jan Paul Acton & Lloyd S. Dixon, Superfund and 
Transaction Costs: The Experience of Insurers and Very Large 
Industrial Firms 32 (1992)(estimating that of the 
approximately $470 million paid in 1989 by insurers for
hazardous waste clean-ups, 88% went to legal costs); see also 
Lloyd S. Dixon, The Transactions Costs Generated by 
Superfund's Liability Approach 183, in Analyzing Superfund: 
Economics, Science and Law, (Richard L. Revesz & Richard B. 
Stewart eds., 1995)(noting that for 1991 alone the private
sector incurred over $4 billion in transactions costs);
William N. Hedeman et al., Superfund Transaction Costs: A 
Critical Perspective on the Superfund Liability Scheme, 21 
Envtl. L. Rep. 10413, 10423 (1991) (30-60% of hazardous waste
clean-up funds go to lawyers). 

-25- 25

interpretation. We note that Charter does not seriously

challenge on this point, preferring to argue that its

interpretation is mandated and that its interpretation meets

the tripartite test. The district court, before entering a

consent decree, is obliged to determine that it is fair,

reasonable and consistent with the goals of CERCLA. DiBiase, 

45 F.3d at 543; Cannons, 899 F.2d at 85. In turn, "an 

appellate court may overturn a district court's decision to

approve or reject the entry of a CERCLA consent decree only

for manifest abuse of discretion." Charles George Trucking, 

34 F.3d at 1085. 

Under the terms of the decree Charter agreed to pay

$215,000 plus interest, in settlement of the government's

claims of approximately $4 million in unrecovered response

costs for the first and second units. In exchange the

government covenanted not to sue or take administrative

action against Charter "pursuant to Sections 106 and 107(a)

of CERCLA or Section 7003 of RCRA relating to the Site,

including for reimbursement of Response Costs or

implementation of ROD I or ROD II."15 Charter also

 

15. The government's covenant not to sue is subject to
certain reservations, including: (a) that with respect to
future liability, the covenant not to sue does not come into
effect until certification by the EPA that remedial action
for the site under ROD I and Rod II is completed; and (b)
reopener provisions which allow the government to seek
further relief if previously unknown conditions or
information reveal that the remedial actions for the site are
not protective of human health or the environment.

-26- 26

receives protection against contribution claims of other

parties from whom the government might subsequently recover 

all or part of its multi-million dollar remainder claim.

Fairness & Reasonableness 

Fairness has a procedural component (involving the

negotiation process, see Cannons, 899 F.2d at 85), which is 

not at issue here, and a substantive component, which is.

Id. at 86. "Substantive fairness introduces into the 

equation concepts of corrective justice and accountability:

a party should bear the cost of the harm for which it is

legally responsible . . . . The logic behind these concepts

dictates that settlement terms must be based upon, and

roughly correlated with, some acceptable measure of

comparative fault, apportioning liability among the settling

parties according to rational (if necessarily imprecise)

estimates of how much harm each PRP has done." Cannons, 899 

F.2d at 87 (citations omitted); see also Charles George 

Trucking, 34 F.3d at 1089 (so long as the basis for a 

sensible "approximation `roughly correlated with some

acceptable measure of comparative fault'" exists,

"difficulties in achieving precise measurements of

comparative fault will not preclude a trial court from

entering a consent decree" (quoting Cannons, 899 F.2d at 

87)).

-27- 27

A district court's reasonableness inquiry, like that

of fairness, is a pragmatic one, not requiring precise

calculations. See Charles George Trucking 34 F.3d at 1085 

(depth of inquiry depends on the context and information

available to the court). The question is whether the decree

provides for an efficient clean-up and adequately compensates

the public for its costs, in light of the foreseeable risks

of loss. See Cannons, 899 F.2d at 89-90. Because the first- 

round settlors have already contracted to implement the

clean-up, we review only the adequacy and efficiency of

implementing the cash settlement reached here. This amounts

to asking whether the terms of the settlement are roughly

proportional to Charter's responsibility and whether they

serve the public interest.

Approval of Charter's cash-out settlement of $215,000

plus interest in exchange for both limited contribution

protection and a limited covenant not to sue from the

government cannot be said to constitute a manifest abuse of

discretion. Although $215,000 is small in absolute terms as

compared to the government's total unrecovered response costs

of $4 million, it must be evaluated in context. In

particular, Charter's liability in this case was uncertain.

It was not clear whether Pacific Oil, the company which had

contributed to the wastes at the Site, was Charter's

predecessor. The degree to which the predecessor's wastes --

-28- 28

soot from oil fuel -- contained hazardous substances that

would have contributed to the Site's contamination was also

at issue. Given the potentially high costs of litigating a

difficult case against Charter and the benefit of a certain

cash settlement (and the limited contribution protection),

the $215,000 plus interest payment passes muster. This court

explained in Cannons: 

In a nutshell, the reasonableness of a
proposed settlement must take into account
foreseeable risks of loss. . . . The same
variable, we suggest, has a further
dimension: even if the government's case is
sturdy, it may take time and money to collect
damages or to implement private remedial
measures through litigatory success. To the
extent that time is of essence or that
transaction costs loom large, a settlement
which nets less than full recovery of clean-
up costs is nonetheless reasonable. . . .
The reality is that, all too often,
litigation is a cost-ineffective alternative
which can squander valuable resources, public
as well as private. 

899 F.2d at 90 (citations omitted). In addition, there are

other non-first-round settlors against whom the government is

currently seeking to recover the remainder of its $4 million

claim.

The question arises as to whether the decree, as

entered, unfairly hurts the interests of third parties. See 

Charles George Trucking, 34 F.3d 1085-89 (addressing third- 

party challenge to entry of CERCLA consent decree). For

purposes of our review, the district court's determination

that the decree does not represent a complete bar to

-29- 29

contribution claims that first-round settlors expected to

have against those that did not settle along with them is

adequate to pass the abuse of discretion threshold.16 Cf. 

Charles George Trucking, at 1088 (in entering a decree it 

might be better to leave technical disputes between settling

parties in a class to the discourse between them). As to the

extinguished contribution claims of non-settlors or later

round settlors, protection against those claims was a

reasonable benefit Charter acquired in exchange for settling

before those others. 

Fidelity to the Statute 

As we noted in Cannons, the two major policy concerns 

underlying CERCLA are ensuring that prompt and effective

clean-ups are put into place and making sure that the PRPs

responsible for the hazards created bear their approximate

share of the responsibility. 899 F.2d at 89-91; cf. United 

States v. Rohm & Haas Co., 721 F.Supp. 666, 680 (D. N.J. 

1989) (noting Congress' goal of expediting effective remedial

 

16. In the separate contribution action between the Acushnet
Group and Charter, Charter had asserted that the consent
decree provided it with an affirmative defense against the
Acushnet Group's contribution claims. The Acushnet Group, in
turn, moved for summary judgment on the issue of whether the
decree afforded Charter such a defense. The district court
denied the motion without ruling on its merits. It is
basically that motion that the parties want us to decide.
However, absent unusual circumstances, denial of a summary
judgment motion is not independently appealable as a final
order. See Pedraza v. Shell Oil Co., 942 F.2d 48, 54-55 (1st 
Cir. 1991), cert. denied, 502 U.S. 1082 (1992). No such 
circumstances exist here.

-30- 30

action and minimizing litigation). Both these goals and the

honoring of the settlement dynamics Congress created in SARA

are effectuated here.

CERCLA, through Section 113(f)(2), provides settling

parties with broad contribution protection so as to encourage

them to settle early. See Browning-Ferris, 33 F.3d at 102- 

03. However, CERCLA also aims to induce those parties who

settle earlier to do so for higher amounts than they might

otherwise by assuring them the right to seek contribution

protection from those who have not as yet settled.17 See 

42 U.S.C. 9613(3)(B); see also S. Rep. No. 11, 99th Cong., 

1st Sess. 44 (1985); cf. Colorado & Eastern, 50 F.3d at 1535 

(Section 113(f)(1) was intended to enable those bearing a

disproportionate share of the liability in a clean-up to

recover from others). Hence, a decree that is read not to

provide second-round settlors with complete contribution

protection against prior settlors is consistent with the goal

of enabling the government to enter into early and large

 

17. An early cash-out settlement may sometimes require the
settling party to pay a premium for the risks the government
bears out of the uncertainty of the total cost of the remedy.
As more is known about the site and as the government decides
on the precise remedy, that uncertainty, and hence the
premium, is reduced, but not eliminated. Here, there were no
settlements until the RODs were issued and the remedy was
outlined. Nonetheless, early settlors, even post-ROD, may
pay some premium. Settlors who actually perform the remedy,
such as the Acushnet Group, assume the risks of the actual
costs of performance. Congress may well have thought it fair
to require later settlors to bear a share of those risks and
premiums. 

-31- 31

settlements. Cf. Akzo, 30 F.3d 767 (interpreting "matters 

addressed" clause of decree not to bar the claims of a PRP

that had undertaken remedial work prior to entry of the

decree); United States v. Alcan Aluminum, Inc., 25 F.3d 

1174, 1186 n.17 (3d Cir. 1994) (in light of the goal of

promoting early large settlements, the assertion of a

contribution defense by a second-round settlor against a

first-round settlor is far more problematic than its

assertion against a non-settlor).

Conclusion 

The district court's order entering the consent

decree is affirmed. 

-32- 32